**MOGINRUBIN LLP**
Daniel J. Mogin (SBN 95624)
Timothy Z. LaComb (SBN 314244)
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone:     (619) 687-6611
dmogin@moginrubin.com
tlacomb@moginrubin.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED INDIVIDUALS,<br><br>        Plaintiff,<br><br>    v.<br><br>MONTE NIDO & AFFILIATES HOLDINGS, LLC,<br><br>        Defendant. | Case No:<br><br>**COMPLAINT FOR:**<br><br>(1) Violation of the California Consumer Privacy Act, Cal. Civ. Code § 1798.150<br>(2) Violation of the Confidentiality of Medical Information Act, Cal. Civ. Code § 56.101<br>(3) Negligence<br><br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jane Doe, individually and on behalf of classes of similarly situated individuals (defined below), brings this action against Defendant Monte Nido & Affiliates Holdings, LLC ("Defendant") and alleges as follows:

## I.   SUMMARY OF THE CASE

1.     Defendant Monte Nido is a healthcare provider that specializes in the treatment of eating disorders. As part of its business, Monte Nido collects and maintains highly sensitive personal identifiable information ("PII") and personal health information ("PHI") for thousands of patients.

2.     According to its notice to affected individuals, on September 16, 2023, Monte Nido lost control of this PII and PHI, as an unauthorized third party gained access to this information (the "Data Breach"). Monte Nido did not detect that its systems had been breached until September 23, 2023—a week after the cybercriminals gained access to its patient data. Monte Nido then did not alert patients impacted by the Data Breach until August 9, 2024— nearly a year after the breach was first detected.

3.     Monte Nido has acknowledged that the information accessed in the Data Breach included at least the following:

a.     name;

b.     Social Security number;

c.     phone number;

d.     email address;

e.     date of birth;

f.     driver's license number;

g.     government identification number;

h.     individual taxpayer identification number;

i.     birth certificate;

j.     email address and password;

k.     digital signature;

1

l.    passport number;

m.    financial account information (account number, routing number or password, or credit and/or debit card number with password or security code);

n.    worker's compensation claim information;

o.    medical record number;

p.    patient account number;

q.    medical information (including prescription information, dates of service, medical history, condition, treatment, or diagnosis);

r.    certificate and/or license number; and

s.    health insurance information.

4.    Monte Nido failed to maintain reasonable security safeguards and protocols to protect its patients PII and PHI. For example, it appears that none of the information accessed in the Data Breach was encrypted. Monte Nido lacked proper controls to detect the hacking and intrusion of its system, as the cybercriminals had more than a week of access before their presence was detected. Monte Nido also lacked proper controls to determine which patients were impacted by the Data Breach, as it was unable to alert impacted patients for nearly a year.

5.    As a result of the misconduct alleged herein, Defendant was negligent and violated the California Consumer Privacy Act of 2018 ("CCPA") and the Confidentiality of Medical Information Act ("CMIA").

## II.    PARTIES

6.    Plaintiff received treatment from Defendant at their center in Lafayette, CA, and entrusted Defendant with significant amounts of PII and PHI, including her complete medical history and payment information. On or about August 9, 2024, Plaintiff received a breach notice from Defendant notifying her that her information was accessed in the Data Breach.

7.    Defendant, Monte Nido is a Limited Liability Company formed in Delaware with its principal place of business at 6100 SW 76th Street, Miami, Florida, 33143.

COMPLAINT

III.   **JURISDICTION AND VENUE**

8.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Monte Nido and at least one class member are citizens of different states. And there are over 100 putative Class members.

9.     This Court has personal jurisdiction over Monte Nido because it conducts substantial business in this district; has conducted systematic and continuous activities in California, including operating multiple clinics in California; and there is a substantial nexus between the conduct Monte Nido directs at California and the claims asserted herein.

10.    Venue is proper in this Court because Plaintiff resides in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

IV.   **CLASS ACTION ALLEGATIONS**

11.    Plaintiff brings this nationwide class action pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following classes:

1.   The Nationwide Class: All individuals whose PII was compromised in the Data Breach; and

2.   The California Class: All persons residing in California whose PII and/or PHI was compromised in the Data Breach.

12.    Specifically excluded from the Classes are Defendant; its officers, directors or employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of Defendant. Also excluded from the Classes are attorneys and staff of law firms participating in this matter and the members of his or her immediate family, any federal, state or local governmental entities, any judicial officer presiding over this action

3

COMPLAINT

and the members of his or her immediate family and judicial staff, and any juror assigned to this action.

13. The Class Period is the full extent of the applicable limitations period, including any tolling or other equitable considerations that extend the limitations period.

14. Class Identity: The Classes are readily identifiable and are classes for which records should exist.

15. Numerosity: Class Members are so numerous and geographically dispersed that joinder is impracticable. Tens of thousands or hundreds of thousands of Class members had their data accessed by an unauthorized third party in the Data Breach.

16. Typicality: Plaintiff's claims are typical of the claims of Class Members because Plaintiff and Class members had their information accessed by an unauthorized third party in the Data Breach due to the same conduct by Defendant.

17. Defendant has acted in a manner that applies generally to Plaintiff and all Class Members. Each Class Member has been similarly impacted by Defendant's failure to implement reasonable security measures to protect Class members' PII and PHI, identify data breaches, or timely measure the scope of data breaches.

18. Commonality: There are questions of law and fact common to the Classes, including:

    (a) Whether Monte Nido had a duty to use reasonable care in safeguarding Plaintiff's and the Class members' PII and PHI;

    (b) Whether Monte Nido breached its duty to use reasonable care with respect to the Data Breach and/or its response to the Data Breach;

    (c) Whether Monte Nido had reasonable systems in place to detect the Data Breach;

    (d) Whether Monte Nido had reasonable systems in place to respond to the Data Breach;

    (e) Whether Monte Nido's notice to Plaintiff and Class members was reasonable; and

COMPLAINT

(f)     Whether Plaintiff and Class members suffered injuries due to the Data Breach.

19.     <u>Predominance:</u> The above-listed questions of law and fact common to all Class Members predominate over questions that may affect individual Class Members.

20.     <u>Adequacy:</u> Plaintiff will fairly and adequately protect the interests of the Classes in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Classes. Plaintiff has also retained counsel competent and experienced in the prosecution of class actions and complex data privacy cases to represent her and the Classes.

21.     <u>Superiority and Manageability:</u> A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class Members is impracticable. The individual prosecution of separate actions by individuals would lead to repetitive adjudication of common questions of fact and law and create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant. There will be no difficulty in the management of this action as a Class action.

## V.     FACTUAL BACKGROUND

22.     Monte Nido is a healthcare provider that specializes in treating eating disorders. It has 52 facilities across 28 states.

23.     Due to the nature of its business, Monte Nido receives and maintains PII and PHI for tens of thousands or hundreds of thousands of patients. Monte Nido repeatedly represented that it would safeguard its patients' data in accordance with internal policies and applicable state and federal law.

24.     Under state and federal law, Monte Nido had a duty to protect the PII and PHI of current and former patients, including under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, and the "CCPA, Cal. Civ. Code § 1798, et seq. It likewise had a duty to alert these patients if their PII and/or PHI was accessed by an unauthorized third party.

25.     Monte Nido also has a Privacy Policy that includes the following representations:

    a.  "We protect the confidentiality and security of information we obtain in the course of business."

    b.  "We use commercially reasonable safeguards, such as industry-standard encryption technology, to help keep the information collected through the Site secure."

    c.  "When Personal Information is transmitted to other websites, it is protected through the use of encryption, such as the Secure Sockets Layer (SSL) protocol."

    d.  "We strive to take appropriate security measures to protect against unauthorized access to or alteration of your Personal Information."

26.     Likewise, Monte Nido purportedly implements the following "Privacy Practices:"

    a.  "Monte Nido and Affiliates or "MNA" understands that information about you and your health is confidential. We are committed to protecting the privacy of this information. We use and share your health information only as permitted or required by federal and state laws."

    b.  "We are required by law to maintain the privacy of your protected health information, to provide you with this Notice of our legal duties and privacy practices with respect to your health information, to notify affected individuals following a breach of unsecured protected health information, and to follow the terms of the Notice currently in effect."

### A.  The Data Breach

27.     An unauthorized third party gained access to Monte Nido's system on September 16, 2023. Monte Nido did not detect the intrusion until September 23, 2023, meaning the cybercriminals had undetected access to its patients' PII and PHI for a week. The unauthorized third party was able to access at least the following patient PII and PHI:

    a.  name;

    b.  Social Security number;

    c.  phone number;

    d.  email address;

    e.  date of birth;

    f.  driver's license number;

g.    government identification number;

h.    individual taxpayer identification number;

i.    birth certificate;

j.    email address and password;

k.    digital signature;

l.    passport number;

m.    financial account information (account number, routing number or password, or credit and/or debit card number with password or security code);

n.    worker's compensation claim information;

o.    medical record number;

p.    patient account number;

q.    medical information (including prescription information, dates of service, medical history, condition, treatment, or diagnosis);

r.    certificate and/or license number; and

s.    health insurance information.

28.    Despite detecting the breach on September 23, 2023, Monte Nido waited until August 9, 2024 – nearly a year – to alert impacted individuals. By keeping these people in the dark, Monte Nido deprived them of the opportunity to protect themselves and/or mitigate their injuries in a timely manner.

29.    This is significant because, as Monte Nido acknowledged in its notice of the Data Breach, there remains a present, continuing, and significant risk of suffering identity theft. Highlighting the ongoing risk to impacted individuals, Monte Nido is encouraging impacted individuals to "protect yourself against medical identify theft" in the following ways:

a.    "Only share health insurance cards with your health care providers and other family members who are covered under your insurance plan or who help you with your medical care;"

b.    "Review the "explanation of benefits statement" which you receive from your health insurance company. Follow up with your insurance company or care provider for any items you do not recognize;"

7

COMPLAINT

c.   "If necessary, contact the care provider on the explanation of benefits statement and ask for copies of medical records from the date of the potential access (noted above) to current date."

30.   Indeed, once data is stolen, malicious actors will either exploit the data for profit themselves or sell the data on the Dark Web to someone who intends to exploit the data for profit. Hackers would not incur the time and effort to breach Monte Nido's systems to access patients' PII and PHI and risk prosecution if the information was not valuable. Therefore, on information and belief, Plaintiff's and Class members' PII and PHI has already been or will imminently be published and sold on the Dark Web.

### B. Failure to Adopt Reasonable Systems and Protections

31.   Monte Nido did not adopt reasonable data systems and protections to safeguard customers' PII or PHI, prevent and detect unauthorized access to this data, or identify users impacted by the Data Breach.

32.   Monte Nido operates a business in which it collects highly personal and potentially stigmatizing data for tens of thousands or hundreds of thousands of patients. It generates millions of dollars annually through its healthcare services and has ample resources to adopt reasonable protections. It also should have known that such protections were necessary given the value of PHI and frequency with which healthcare providers are subject to data breaches.

33.   On information and belief, Monte Nido failed to:

a.   adequately train its employees on cybersecurity protocols;

b.   implement reasonable security measures to prevent data breaches;

c.   implement reasonable security measures to detect data breaches;

d.   implement reasonable security measures to comprehend the scope of data breaches; and

e.   implement reasonable security measures to timely determine who was impacted by data breaches;

34.     Monte Nido is now attempting to adopt and implement reasonable data systems and procedures. As it declared following the Data Breach, Monte Nido is now "implementing additional cybersecurity safeguards, as needed, enhancing [its] employee cybersecurity training, and improving [its] cybersecurity poclicies, procedures, and protocols." But these measures are too late for Plaintiff and Class members. Monte Nido should have implemented these measures before the Data Breach.

35.     Monte Nido has done little to help those impacted by the Data Breach. It appears to have offered credit monitoring services to only some of the victims. These services do not compensate Plaintiff or Class members for the injuries sustained to date and, at most, provide some protections moving forward.

### C.  Plaintiff's and Class Members' Injuries

36.     Plaintiff is a former patient of Monte Nido, having received services at Monte Nido's treatment center in Lafayette, California. Monte Nido, therefore, collected and maintained Plaintiff's medical history and payment information, in addition to countless other pieces of PII.

37.     Plaintiff and Class members reasonably believed Monte Nido would use reasonable measures to protect their PII and PHI according to its internal policies and state and federal law. Monte Nido obtained and maintains Plaintiff's and Class members' PII and PHI. Monte Nido, therefore, has a continuing legal duty and obligation to protect the data from unauthorized access and disclosure.

38.     Plaintiff and Class members believed that a portion of the funds they paid for services from Monte Nido would be used to pay for adequate cybersecurity for their PII and PHI. On information and belief, and given the dates of the Data Breach, Plaintiff's and Class members' PII and PHI has already been published—or will be published imminently—by the hackers on the Dark Web.

COMPLAINT

39.    Plaintiff and Class members have spent and will continue to spend time and effort monitoring their data and addressing issues caused by the Data Breach. In fact, Monte Nido instructed these parties to take these steps in its notice concerning the Data Breach.

40.    Plaintiff and Class members now fear for the security of their personal and medical information and worry about information that was exposed in the Data Breach.

41.    Due to Monte Nido's Data Breach, Plaintiff and Class members have suffered from anxiety, sleep disruption, stress, fear, and frustration due to the Data Breach. Such injuries go far beyond allegations of mere worry or inconvenience and are the type of personal injuries that the law contemplates and addresses.

42.    Plaintiff and Class members have a continuing interest in ensuring that their PII and PHI—which appears to remain in Monte Nido's possession—will be secure from any future hacking attempts.

43.    Plaintiff and Class members have suffered a significant loss in the value of their PII and PHI. Specifically, due to the Data Breach, Plaintiff and Class members have suffered:

a.    loss of the opportunity to control how their PII and PHI is used;

b.    diminution in value of their PII and PHI;

c.    compromise and continuing publication of their PII and PHI;

d.    out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

e.    lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, inter alia, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.    unauthorized use of their stolen PII and PHI; and/or

g.    continued risk of exposure of their PII and PHI—which remains in Monte Nido's possession—and is, therefore, at significant risk given Monte Nido's lack of appropriate safeguards concerning their date.

44.    There is a significant market for stolen PII and PHI. In fact, PHI is one of the most valuable pieces of information a person possesses and some of the costliest information to

10

COMPLAINT

have stolen. A study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to pay out-of-pocket costs for fraudulent medical care. Victims of healthcare data breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."

45.     Likewise, according to a 2021 article from Forbes, "[r]eports show the value of a health record can be worth as much as $1,000, whereas on the dark web, a credit card number is worth $5 and Social Security numbers are worth $1."

46.     According to a 2017 article from Forbes, electronic medical records were worth "hundreds or even thousands of dollars," while social security numbers were worth $0.10 and credit card numbers were worth $0.25.

47.     Healthcare providers also spend millions of dollars annually to purchase health data and medical data. In fact, the medical data industry was valued at over $2.6 billion as of 2014, and this value has only increased exponentially in the ten years since this estimate was generated.

48.     Due to the extremely high value of PHI, healthcare providers have experienced disproportionately high rates of data theft attempts and events. Healthcare providers, including Monte Nido, knew or should have known this fact. Indeed, it is very likely that Monte Nido received warnings from the Federal Bureau of Investigation (the "FBI") and/or the U.S. Secret Service that it was at a high risk of a data incident.

49.     Compensating Plaintiff and Class members for their out-of-pocket expenses associated with the Data Breach is not sufficient to make them whole. According to the Department of Justice's Bureau of Justice Statistics ("BJS"), nearly one-third of "victims who had personal information used for fraudulent purposes . . . spent a month or more resolving

11

problems." In fact, for some victims, the BJS found that it took more than a year for them to resolve the issues.

50.    Finally, given that the fraudulent activity stemming from the Data Breach may not come to light for several years, Plaintiff and Class members now face years of constant surveillance of their financial and personal records, and the loss of time and money that comes with this.

### D. Monte Nido Did not Follow FTC Guidelines or Industry Standards

51.    According to guidance from the FTC, businesses that collect consumer data should factor in the need for adequate data security into all business decision-making. The FTC has also provided guidance that identifies practices that allow companies like Monte Nido to protect themselves against a data breach, i.e., established industry standards for adequate protection against data incidents.

52.    As part of its 2016 guidelines, the FTC explained that, in order to adequately protect user data, a company should, among other things:

    a.    encrypt information stored on computer networks;

    b.    understand their network's vulnerabilities;

    c.    implement policies to correct security problems;

    d.    have response plans in place to ensure an adequate and timely response to a data breach;

    e.    require complex passwords to navigate the systems;

    f.    use industry-tested security methods;

    g.    have monitoring systems in place to detect suspicious activity; and

    h.    verify that third-party service providers have reasonable security systems in place.

53.    Companies that fail to employ reasonable security systems and procedures may face an enforcement action from the FTC, as it often interprets such failures as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

54.     Several practices have been established that provide baseline industry standards for businesses. These best practices include:

a.      educating all employees;

b.      strong passwords;

c.      multi-layer security, including firewalls, anti-virus, and anti- malware software;

d.      encryption (making data unreadable without a key);

e.      multi-factor authentication;

f.      backup data; and

g.      limiting which employees can access sensitive data.

Other industry standard best practices include:

h.      installing appropriate malware detection software;

i.      monitoring and limiting network ports;

j.      protecting web browsers and email management systems;

k.      setting up network systems such as firewalls, switches, and routers;

l.      monitoring and protection of physical security systems;

m.      protection against any possible communication system; and

n.      training staff regarding critical points.

55.     Based on information and belief, Monte Nido failed to implement several of these standard best practices, which directly and proximately caused the Data Breach.

### E.  Monte Nido did not Adhere to HIPAA Security Provisions

56.     The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.

57.     HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI and PHI is properly maintained.

13

COMPLAINT

58.     The Data Breach itself resulted from a combination of inadequacies showing Monte Nido failed to comply with safeguards mandated by HIPAA. Monte Nido's security failures include, but are not limited to:

a.   failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b.   failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c.   failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d.   failing to ensure compliance with HIPAA security standards by Monte Nido's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e.   failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.   failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.   failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.   failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.   failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

## F.   Tolling

59.     Any applicable statute of limitations has been tolled by Monte Nido's knowledge and concealment of the unlawful conduct and misrepresentations alleged herein. Plaintiff and Class Members could not have discovered Monte Nido's unlawful conduct through reasonable diligence.

60.     Monte Nido knowingly, actively, affirmatively and/or negligently concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on Monte Nido's concealment.

## VI.     CLAIMS ALLEGED ON BEHALF OF THE CLASSES

### COUNT I

#### Violation of the California Consumer Privacy Act, Cal. Civ. Code § 1798.150
#### (On Behalf of the California Class)

61.     Plaintiff incorporates the above paragraphs as if fully set forth herein.

62.     The CCPA provides consumers with a private right of action against businesses when their personal information is subject to unauthorized access, theft, or disclosure as a result of a business's breach of its duty to take reasonable steps to protect that information.

63.     Plaintiff and the California Class members are "consumers" as defined in the CCPA.

64.     Defendant is a "business" as that term is defined in the CCPA.

65.     Defendant stored Plaintiff's and the California Class members' personal information as defined in Cal. Civ. Code § 1798.81.5(d)(1)(A), including but not limited to their full names, dates of medical services provided, medical histories, conditions, treatment, health insurance applications and claim information.

66.     Defendant has a duty to implement and maintain reasonable security procedures and practices to protect their patients' and customers' personal information. As detailed herein, Defendant failed to do so, including by storing or transmitting the information in unencrypted and non-redacted form, or in some other form that permitted unauthorized individuals to access that information in violation of the CCPA.

67.     As a direct and proximate result of Defendant's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiff's

COMPLAINT

personal information, Plaintiff suffered unauthorized access and disclosure of her personal information.

68.     Plaintiff and the California Class members seek actual pecuniary damages suffered due to the Data Breach and injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards customers' PII and PHI by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold their PII and PHI. Plaintiff and California Class members have an interest in ensuring that their PII and PHI is reasonably protected.

69.     On September 10, 2024, Plaintiff's counsel sent a notice letter to Defendant's registered agent, and emailed a copy of the notice to Defendant as well. Assuming Defendant cannot cure the data breach within 30 days, which is likely an impossibility given the facts of this case, then Plaintiff intends to promptly amend the complaint to seek actual damages and statutory damages of $750 per California Class member.

## COUNT II

### <u>Violation of the Confidentiality of Medical Information Act, Cal. Civ. Code § 56.101</u>
**(On Behalf of the California Class)**

70.     Plaintiff incorporates the above paragraphs as if fully set forth herein.

71.     California Civil Code § 56.101, subdivision (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

72.     Any health care provider who "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of § 56.36," which include actual damages

and nominal damages of one thousand dollars ($1,000). To recover nominal damages under §

56.36, "it is not necessary that the plaintiff suffered or was threatened with actual damages."

73.     Monte Nido is a provider of health care that creates, maintains, preserves, or

stores medical information. As described herein, Monte Nido failed to maintain, preserve, or

store Plaintiffs' and California Class Members' medical information in a manner that preserves

its confidentiality.

74.     Monte Nido was negligent in failing to maintain the confidentiality of Plaintiffs'

and California Class Members' medical information. Monte Nido owed Plaintiffs and

California Class Members a statutory and common-law duty to maintain the confidentiality of

their medical information. As detailed herein, Monte Nido breached that duty. Monte Nido's

breach of its duty directly and proximately caused harm to Plaintiffs and California Class

Members.

75.     The hackers viewed Plaintiffs' and California Class Members' medical

information, as that term is defined by the CMIA, including their dates of medical services

provided, medical histories, conditions, treatment, health insurance applications and claim

information. Hackers had undetected access to, and did access, Plaintiffs' and California Class

Members' medical information for a full week.

76.     Plaintiff and California Class members have and will continue to suffer

damages as a result of this violation and Defendant is liable for those damages.

## COUNT III

### Negligence
### (On Behalf of the Nationwide Class)

77.     Plaintiff incorporates the above paragraphs as if fully set forth herein.

78.     Plaintiff and the Nationwide Class entrusted their PII to Monte Nido based on

the understanding that Monte Nido would take reasonable steps to safeguard this data.

79.     Monte Nido owed a duty of care to Plaintiff and Nationwide Class members concerning their PII and PHI because it was foreseeable that any failure by Monte Nido to adopt adequate security systems consistent with industry standards would increase the risk that Plaintiff's and Nationwide Class members' PII would be accessed by cybercriminals in a data breach.

80.     As a healthcare provider with 52 facilities across 28 states, Monte Nido has full knowledge of the sensitivity of the PII at issue in this case and the harm that unauthorized access can cause for Plaintiff and Nationwide Class members.

81.     Monte Nido owed these duties to Plaintiff and Nationwide Class members because they are members of a well-defined, foreseeable, and probable class of individuals that Monte Nido knew or should have known would suffer injury-in-fact from Monte Nido's inadequate security practices and systems.

82.     Monte Nido owed Plaintiff and Nationwide Class members at least the following duties:

    a.     to exercise reasonable care in handling and using the PII in its care and custody;

    b.     implement industry standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

    c.     promptly detect attempts at unauthorized access; and

    d.     notify Plaintiff and Nationwide Class members within a reasonable timeframe of any breach to the security of their PII.

83.     Therefore, Monte Nido owed a duty to timely and accurately disclose to Plaintiff and Nationwide Class members the scope, nature, and occurrence of the Data Breach. Plaintiff and Nationwide Class members needed Monte Nido to take appropriate measures to timely protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

84.     Monte Nido also had a duty to exercise appropriate clearinghouse practices to remove PII when it was no longer necessary to retain under applicable regulations.

85.     Monte Nido knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Nationwide Class involved an unreasonable risk of harm to Plaintiff and the Nationwide Class, even if the harm occurred through the criminal acts of a third party.

86.     Monte Nido's duty to use reasonable security measures arose because of the special relationship that existed between Monte Nido, on the one hand, and Plaintiff and Nationwide Class members, on the other hand. That special relationship arose because Plaintiff and Nationwide Class members entrusted Monte Nido with their confidential PII, a necessary part of obtaining healthcare services from Defendant.

87.     Under the FTC Act, 15 U.S.C. § 45, Monte Nido had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Nationwide Class members' PII.

88.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Monte Nido's duty to protect Plaintiff and the Nationwide Class members' sensitive PII.

89.     Monte Nido violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Monte Nido's conduct was particularly unreasonable given the nature and amount of PII Monte Nido had collected and stored and the foreseeable

consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

90.    Similarly, under HIPAA, Monte Nido had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiff's and Class members' PHI.

91.    Monte Nido violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed supra. Here too, Monte Nido's conduct was particularly unreasonable given the nature and amount of PHI that Monte Nido collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

92.    The risk that unauthorized persons would attempt to gain access to the PII and PHI at issue here and misuse it was foreseeable. Given that Monte Nido holds vast amounts of PII and PHI, it was inevitable that unauthorized individuals would attempt to access their databases—whether by malware or otherwise.

93.    PHI is highly valuable, and Monte Nido knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PHI of Plaintiff and Nationwide Class members and the importance of exercising reasonable care in handling it.

94.    Monte Nido improperly and inadequately safeguarded the PHI of Plaintiff and the Nationwide Class in deviating from industry standards, regulations, and practices at the time of the Data Breach.

95.    Monte Nido breached these duties as evidenced by the Data Breach.

96.    Monte Nido acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Nationwide Class members' PII and PHI by:

    a.    disclosing and providing access to this information to third parties and

b.   failing to properly supervise both the way the PII and PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

c.

97.     Monte Nido breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PHI of Plaintiff and Nationwide Class members which actually and proximately caused the Data Breach and Plaintiff and Nationwide Class members' injury.

98.     Monte Nido further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Nationwide Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Nationwide Class members' injuries-in-fact.

99.     Monte Nido has admitted that the PII and PHI of Plaintiff and the Nationwide Class was wrongfully lost, accessed, and/or disclosed to unauthorized third persons because of the Data Breach.

100.     As a direct and traceable result of Monte Nido's negligence and/or negligent supervision, Plaintiff and Nationwide Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

101.     And, on information and belief, Plaintiff's PII and PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

102.     Monte Nido's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Nationwide Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII and PHI by criminals, improper disclosure of their PII and PHI, lost benefit of their bargain, lost value of their PII and PHI, and lost time and money incurred to mitigate and

remediate the effects of the Data Breach that resulted from and were caused by Monte Nido's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.    Determining that this action is a proper class action under Federal Rule of Civil Procedure 23, certifying Plaintiff as class representative, and appointing the undersigned counsel as Class counsel;

B.    An award of compensatory damages, punitive damages, statutory or civil penalties to Plaintiff and the Classes as warranted by applicable law;

C.    Injunctive or other equitable relief that directs Defendant to implement reasonable security procedures and practices to protect customers' PII and PHI that conform to relevant federal and state guidelines and industry norms;

D.    Awarding Plaintiffs and the Classes reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

E.    Such other relief as the Court may deem just and proper.

## VIII.   JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable as of right.


DATED: September 11, 2024

MOGINRUBIN LLP

_____/s/ Tim LaComb_____
Timothy Z. LaComb (SBN 314244)
Daniel J. Mogin (SBN 95624)
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone:     (619) 687-6611

dmogin@moginrubin.com
tzlacomb@moginrubin.com


*Attorneys for Plaintiffs*